UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

LONNY M. PENN,

                Plaintiff,

    v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.

_____/

No. C 13-05689 LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**[Re: ECF Nos. 17 and 19]**

### INTRODUCTION

On December 9, 2013, Lonny M. Penn, who is proceeding *pro se*, filed a complaint seeking judicial review of a final decision by the Commissioner of Social Security, Carolyn W. Colvin, denying his supplemental security income ("SSI") benefits for his claimed disabilities caused by spinal injury. (Complaint, ECF No. 1.) The Administrative Law Judge ("ALJ") found that Mr. Penn has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except he is not able to climb ladders, ropes, or scaffolds. (Administrative Record ("AR") 13-20.) Now, Mr. Penn and the Commissioner both move for summary judgment. (Motion, ECF No. 17; Cross-Motion and Opposition, ECF No. 19.) All parties have consented to the court's jurisdiction. (ECF Nos. 6, 12.) Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. For the reasons stated below, the court grants Mr. Penn's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and

UNITED STATES DISTRICT COURT
For the Northern District of California

remands the action for further proceedings.

**STATEMENT**

## I. PROCEDURAL HISTORY

Mr. Penn applied for SSI on November 1, 2010, alleging disability beginning July 4, 1997.  (AR 156-163.)  It appears from the record that he may have received SSI benefits after a 1997 accident that resulted in a spinal cord injury.  (*See* AR 39, 276.)  In 2011, Mr. Penn reported to the state agency consultant Dr. Sanford Selcon that he received SSI benefits after his accident until he went to prison in 2004, at which time his benefits were terminated.  (AR 276.)  Through his 2010 application, he seeks reinstatement of those prior benefits.  (AR 276.)

The Commissioner denied Mr. Penn's claims initially on June 20, 2011 and upon reconsideration on July 27, 2011.  (AR 57-60, 64-69.)  On September 6, 2011, Mr. Penn requested a hearing before an ALJ, and it was scheduled for March 29, 2012.  (AR 76-77, 114-115.)  ALJ Philip E. Callis granted a continuance of the hearing at Mr. Penn's attorney's request because Mr. Penn was intoxicated at it.  (AR 48-51.)

ALJ Daniel G. Heely conducted a hearing on July 19, 2012 in Stockton, California.  (AR 10-47.)  Mr. Penn was represented by attorney Shellie Lott.  (AR 13.[1])  Mr. Penn and vocational expert Cheryl R. Chandler (the "VE") testified.  (*Id.*)  At the hearing before the ALJ, there was this colloquy between Mr. Penn and his attorney:

Q: [Y]ou were on disability previously, is that right?

A: Yes, ma'am.

Q: And then you were cut off when you were incarcerated?

A: Yes, ma'am.

(AR 39.)

On August 8, 2012, the ALJ issued his decision that Mr. Penn was not disabled under the Social Security Act.  (AR 13-20.)  On September 25, 2013, the Appeals Council denied Mr. Penn's request

---

[1] The court notes that the ALJ's decision states that Mr. Penn was represented by attorney Langley Kreuze, but the transcript from the July 19, 2012 hearing states that Mr. Penn was represented by attorney Shellie Lott at that hearing.  (*Compare* AR 13 *with* AR 25.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-5.)

2         On December 9, 2013, Mr. Penn filed the complaint in this action.  (Complaint, ECF No. 1.)

3    Because Mr. Penn did not move for summary judgment by April 30, 2014, in accordance with the

4    court's Social Security Procedural Order, ECF No. 2, the court ordered him to show cause, in

5    writing, why his action should not be dismissed for failure to prosecute.  (Order, ECF No. 16.)

6    By fax dated October 22, 2014, Mr. Penn responded to the order to show cause, stating that the

7    Commissioner improperly denied his claim for benefits because he previously had been awarded

8    benefits and an ALJ already ruled that he should receive benefits.  (*See* Motion ECF No. 17 at 3.)

9    Mr. Penn also stated that he is much worse now than when he previously was determined to be

10   disabled and entitled to benefits.  (*See id.*)

11        Because Mr. Penn is representing himself on this appeal, the court construed Mr. Penn's October

12   22, 2014 filing as a motion for summary judgment and found that he timely filed it.  (Order, ECF

13   No. 18 at 2, citing *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013).)  The Commissioner

14   filed an opposition and cross-motion for summary judgment, arguing only that in Mr. Penn's motion

15   for summary judgment, "he does not challenge any aspect of the ALJ's decision, nor does he

16   advance any argument based on the evidence of record, which supported that decision."  (Cross-

17   Motion and Opposition, ECF No. 19.)  Mr. Penn did not file a reply to the Commissioner's cross-

18   motion and opposition.

19   **II.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

20        This section summarizes the medical evidence in the administrative record from (A) Mr. Penn's

21   treating physicians, (B) his non-treating physicians, (C) the hearing testimony, and (D) the ALJ's

22   findings.

23        **A.  Medical Evidence: Treating Physicians**

24             ***1.  Physical Medicine and Rehabilitation, Dr. Peter C. Werner (January 21, 1998)***

25        On July 4, 1997, Mr. Penn was injured after a fall from a moped, and he injured his spine.  (AR

26   237.)  On July 10, 1997, Mr. Penn was transferred to Santa Clara Valley Medical Center Spinal Cord

27   Injury Unit and was under Dr. Peter C. Werner's care for acute comprehensive spinal cord injury

28   care and rehabilitation until his discharge on August 15, 1997.  (*Id.*)  In Dr. Werner's letter dated

January 21, 1998, he noted Mr. Penn's dependence on a wheelchair and opined that Mr. Penn required assistance with some of his activities of daily living.  (*Id.*)  Considering Mr. Penn's injuries and mobile limitations, Dr. Werner felt it would be a hardship for him to serve time in prison due to his daily medical and physical needs.  (*Id.*)

### 2. Dr. David Gershan (March 28, 2001)

In a letter dated March 28, 2001, Dr. David Gershan, who had been treating Mr. Penn since November 15, 2000, confirmed Mr. Penn's severe spinal cord injury, chronic pain, fecal incontinence, and weakness of extremities.  (AR 238.)  Dr. Gershan said that Mr. Penn should be considered for low-income housing that was on the first floor or elevator accessible with financial help that would include transportation and therapy.  (*Id.*)

### 3. Treatment Records From California Department of Corrections

The administrative record contains two exhibits of medical records from Mr. Penn's time at the California Department of Corrections ("CDC"): 1F (records dated 10/10/2003 to 7/28/2010) and 2F (records dated 3/5/2008 to 10/15/2010).  The following sections summarize the relevant records.

#### a. Intake Records in 2004

Although the 2004 physician assessment has handwritten notes that are too faint to read (*see* AR 243), 2004 CDC records at intake reflect a medical assessment of Mr. Penn's cervical spinal cord injury, residual right-side weakness, loss of proprioception, problems with balancing, use of a cane, and permanent mobility impairment.  (AR 239-240.)

#### b. Mariana Lotersztain, M.D., and Nicolas Aguilera, M.D. (March 24, 2008)

The 2008 CDC records are consistent with those at intake from 2004.  Mr. Penn received x-rays on March 12, 2008, which reflect (among other things) moderate degenerative changes at the L3-4 level and the post-surgical changes of the previous left total hip replacement.  (AR 246.)  On March 24, 2008, Dr. Mariana Lotersztain and Dr. Nicolas Aguilera (CDC physicians) noted that Mr. Penn had a "history of motor vehicle accident resulting in a spinal cord injury at C2-C4."  (AR 245.)  They also noted that he "experienced a quadriparesis but has regained most of his motor strength," "has mild left-sided hemiparesis," and "needs an elevator pass, a cane, and housing on a low bunk."  (*Id.*)  They opined that Mr. Penn's condition was chronic, stable, and non-progressive.  (*Id.*)  They

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   reported that Mr. Penn could not walk for more than 100 yards without resting for thirty minutes.

2   (*Id.*)  Mr. Penn could lift up to ten pounds.  (*Id.*)  Dr. Lotersztain and Dr. Aguilera found Mr. Penn

3   unable to bend, squat, kneel, climb, reach above shoulder level, drive, or work in high places.  (*Id.*)

4   　　　　　　　　　　*c. 2009-2010 records*

5   　　　On April 22, 2009, M. Hopkins (apparently a nurse practitioner) said in her assessment of Mr.

6   Penn that he was unable to climb, bend, stoop, or twist, and was limited to standing for fifteen

7   minutes every thirty minutes, sitting for thirty minutes every sixty minutes, prolonged walking for

8   more than 500 feet without resting, and lifting over ten pounds.  (AR 241.)  She classified the

9   duration of her assessment as one year.  (*Id.*)

10   　　　Other notes in the record span from 2009 to 2010 reflect Mr. Penn's complaint of lower back

11   pain, complaints of imbalance and equilibrium requiring use of a cane (and a physician assistant's

12   apparent disagreement about that need in 2009 based on Mr. Penn's walking quickly without it),

13   denial of bowel and bladder disfunction, and prescription for Neurontin/Gabapentin.  (AR 257-261.)

14   　　　　　　**4. *Post-release Treatment Records (2010 to 2012)***

15   　　　The AR has the following medical records that post-date Mr. Penn's release from the CDC: (a)

16   records from Community Medical Centers from December 29, 2010 to December 12, 2011 (Ex. 13F,

17   AR 303-312, and Ex. 16F, AR 319-322), and (b) records from San Joaquin General Hospital dated

18   January 12, 2012, March 2, 2012, May 10, 2011 to March 2, 2012, and March 2, 2012 to June 13,

19   2012.  (Exs. 14F, 15F, 17F, 18F, and 19F, AR 313-318, 323-352.)

20   　　　　　　*a. Community Medical Center (December 29, 2010 to December 12, 2011)*

21   　　　These records are at Exhibits 13F and 16F.  (AR 303-312, 319-322.)

22   　　　On December 29, 2010, Dr. Deepthy Damien's records reflect Mr. Penn's reported back pain, his

23   lumbar spine injury (including decreased range of motion secondary to pain), and the lack of pain

24   medication for the past year except aspirin occasionally at the CDC.  (AR 312.)  In support of Mr.

25   Penn's application for a fixed route discount fare card from the San Joaquin Regional Transit

26   District, on December 29, 2010 Dr. Damien filled out the section entitled "medical diagnosis of

27   disability" with the following: "chronic low back pain secondary to spinal cord injury."  (AR 322.)

28   Dr. Damien noted that Mr. Penn used a cane and answered "no" to the question, "Is the applicant's

United States District Court
For the Northern District of California

1    disability temporary?"  (*Id.*)

2        2011 records reflect Mr. Penn's neuropathic pain due to the spinal cord injury and the continued

3    prescription by Dr. Khambati of neurontin for that problem.  (AR 308.)

4                       *b. San Joaquin General Hospital (May, 2011 - June, 2012 )*

5        These records span May 10, 2011 to June 2012 and are at Exhibits 14F, 15F, 17F, 18F, and 19F.

6    (AR 313-318, 323-352.)

7        Mr. Penn received regular treatment from James Liang, D.O., at the San Joaquin General

8    Hospital from May 2011 to June 2012 for his chronic pain syndrome, back and hip pain, spinal cord

9    injury, left hip replacement in 1996, fecal incontinence, hypertension, and tobacco abuse.  (AR 313-

10   318, 323-352.)  The "problem list" reflects Dr. Liang's diagnoses (with the appropriate ICD-9 code)

11   for chronic pain syndrome, spinal cord injury, fecal incontinence, and hypertension, and it also

12   reflects his hip replacement.  (AR 317.)  The x-rays of Mr. Penn's left hip taken on September 2,

13   2011 showed radiolucency with a sclerotic margin about the roof of the acetabulum.  (AR 336.)

14       The medical record from May 10, 2011 reflects Dr. Liang's assessment of Mr. Penn as follows:

15   chronic pain syndrome because of the spinal cord injury.  (AR 342.)  It notes a discussion about a

16   filing for "SJ County Human Services" and notes that he needs a note for "light duty."  (*Id.*)  It

17   continues with the notation, "Unsure reason Pt. [patient] is here. ? doctor shopping."  Dr. Liang

18   continues, "note filled to the best of my ability.  light duty. – sitting job."  (*Id.*)  He continues, "no

19   lifting.  No standing ≥ 10 min.  No walking ≥ 10 min", and then he modifies all of these with, "at a

20   time."  (*Id.*)

21       By October 13, 2011, Dr. Liang's records reflect Mr. Penn's chief complaint as "Consult left hip

22   pain" with the onset date in 1997.  (AR 329.)  Regarding "Spine," it notes "Quadparesis.  Slow

23   improvement.  Still weakness; balance; Numbness 10% Fingers + Hands."  (*Id.*)

24       In March 2012, Dr. Liang notes an appointment by Mr. Penn to follow up on his application for

25   disability.  (AR 324.)  The record reflects Mr. Penn's use of a walking cane and Dr. Liang's

26   assessment of him as having chronic pain syndrome, stable high blood pressure, and tobacco abuse.

27   (AR 324-25.)  Dr. Liang notes that he cannot fill out a work-capacity evaluation as it is outside the

28   scope of his practice, and not covered "from MAP."  (AR 325.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1   On April 12, 2012, Dr. Liang noted that Mr. Penn's chronic back pain syndrome was stable.

2   (AR 315.)

3   On June 13, 2012, Dr. Liang noted an assessment of "chronic pain syndrome,"

4   allergies/bronchitis, and hypertension, and he notes the pending Medicaid/SSI application.  (AR

5   344-345.)

6   Mr. Penn's medications include pain relievers and neurontin related to the spinal cord injury.

7   (AR 351-352.)

8   **B.  Medical Evidence: Non-Treating Physicians**

9     *1.  Stanford Selcon, M.D. (June 13, 2011)*

10  On June 13, 2011, Dr. Stanford Selcon, state agency consultant, performed a complete internal

11  medicine evaluation of Mr. Penn.  (AR 275-282.)  He did not review any of Mr. Penn's medical

12  records and instead relied on Mr. Penn's self-reporting.  (AR 277; *see also* 3/27/2012 brief to ALJ,

13  AR 232.)

14  Dr. Selcon described Mr. Penn as a "thin male who walks with no limp.  He has an assistive

15  device [apparently, a cane] with him that he uses for balance and for pain but for ambulation, it is

16  not required.  Range of motion of his back is normal."  (AR 278.)  Dr. Selcon noted that Mr. Penn's

17  "[r]ange of motion of the neck is within normal limits," and "there are no paravertebral muscle

18  spasms or tenderness of back.  Straight leg is negative at 90 degrees.  Range of motion of the back is

19  normal."  (*Id.*)  Dr. Selcon observed that Mr. Penn's motor strength in the upper and lower

20  extremities "was excellent at 5+."  (AR 279.)  Dr. Selcon diagnosed Mr. Penn with history of

21  arthralgias of the hands, hips, neck, and lower back since 1997, etiology uncertain and history of

22  spinal cord injury with incomplete quadriplegia with complete resolution from a motor point of

23  view.  (*Id.*)  Dr. Selcon opined that the claimant had no functional limitations.  (AR 280.)

24    *2.  Dr. J. Zheutlin, M.D. (July 21, 2011)*

25  On July 21, 2011, Dr. J. Zheutlin, a state agency consultant, filled out a Physical Residual

26  Functional Capacity Assessment form about Mr. Penn.  (AR 290-295.)

27  The exertional limitations Dr. J. Zheutlin found are as follows.  Mr. Penn can occasionally lift

28  and/or carry (including upper pulling) 20 pounds and frequently lift and/or carry (including upper

pulling) 10 pounds.  (AR 291.)  He can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday.  (*Id.*)  He can push-pull (including operation of hand/foot control) ability is "unlimited, other than shown for lift and/or carry."  (*Id.*)

The postural limitations Dr. J. Zheutlin found are as follows.  Mr. Penn can occasionally climb ramps/stairs but never a ladder/rope/scaffolds.  (AR 292.)  He can never balance.  (*Id.*)  He can occasionally stoop, kneel, crouch, and crawl.  (*Id.*)

Dr. J. Zheutlin also found that no manipulative, visual, or communicative limitations are established.  (AR 292-293.)

As for Mr. Penn's environmental limitations, Dr. J. Zheutlin said that Mr. Penn should avoid even moderate exposure to vibration, and avoid all exposure to hazards (defined as "machinery, heights, etc.").  (AR 293.)

The assessment references the October 27, 2009 physician's assistant note from the CDC about the need for a cane given Mr. Penn's gait.  (AR 294.)

### C. Administrative Hearing

#### 1. Mr. Penn's Pre-Hearing Brief

Mr. Penn's pre-hearing brief is at AR 232 to 233 and was filed by Mr. Penn's then counsel.  It notes that Dr. Selcon found no limitations, but points out that, "as DDS reviewers note, [he] had no records to review."  (AR 232.)  It argues that while the DDS reviewers limited Mr. Penn to a light RFC with occasional postural limitations, and some environmental limitations, the records support a more limiting RFC (pointing to 2001 medical records showing chronic spine disability and severe arthritis in 2001, and moderate degenerative changes at L3-4 as shown by the 2008 x-rays).  (*Id.*)  It points out that DDS reviewers and Dr. Selcon did not review the Community Medical Center records (which include Mr. Penn's application for a fixed route discount fare card) or the San Joaquin General Hospital records that reflect Mr. Penn's continued treatment with medication for neuropathic pain (the Neurotin/Gabentin) and the fecal incontinence that results from the spine injury.  (AR 232-233.)

### 2. Mr. Penn's Testimony

Mr. Penn testified before the ALJ on July 19, 2012.  (AR 13.)

The ALJ examined him first.  Mr. Penn testified he had a left total hip replacement in 1996.  (AR 30.)  On July 4, 1997, Mr. Penn flipped a Vespa scooter which landed directly on the back of his neck, which made him "quadriplegic, incomplete."  (*Id.*)  In response to questions about his physical difficulties, Mr. Penn said that he had numbness in his hands and that his back and hip both were "really, really bad."  (AR 29.)  He did not have a laminectomy because he would "have more chances of becoming paralyzed again with the surgery" than he was.  (AR 30.)

Mr. Penn also has high blood pressure and breathing problems that made him sometimes rely on inhalers.  (AR 31.)  He used to smoke one pack a day until two months ago, at which point he cut down to five cigarettes per day because of his allergies.  (*Id.*)  After the accident, he served seven years in jail due to domestic violence but he now was on parole.  (AR 32.)

Mr. Penn testified that he takes the bus, goes to the restaurant downstairs underneath his apartment "every once in a while," and likes to fish, which he does about once every other week.  (AR 36.)  He can do basic light things including microwaving and grocery shopping.  (AR 34.)  He receives food stamps and cash aid.  (*Id.*)  He visits a friend who lives three blocks away three or four times a week, and they visit back and forth at each other's homes.  (AR 37.)

His attorney then questioned him.  Mr. Penn testified that it was hard for him to work because his back gives out, and he does not have fine motor skills in his fingers.  (*Id.*)  He has numbness in his fingers.  (AR 38.)  He works at the Welfare Office for six days a month.  (*Id.*)  His duties were to put forms together and staple them.  (*Id.*)  Mr. Penn stated that he had some trouble doing the work because the arthritis in his hands causes them to cramp.  (AR 39.)  He thus takes his time and goes slowly.  (*Id.*)  In response to a request to "explain what problems you are having," he responded that he has fecal incontinence and has at most two minutes to get to the bathroom.  (*Id.*)  He was not in diapers at the hearing and explained that he can no longer afford diapers.  (*Id.*)  He can walk without his cane, but he uses the cane for balance and support.  (AR 41.)

The ALJ then questioned Mr. Penn again about his work at Micro Images in 1998, coding paperwork full time.  (AR 42.)  Mr. Penn testified that he lifted up to 10 pounds.  (*Id.*)

### 3. *Vocational Expert*

Vocational expert Cheryl R. Chandler also testified at the hearing.  (AR 42-47.)  The ALJ asked the VE to describe Mr. Penn's past work.  (AR 42.)  The label coder job (DOT #920.587-014) that Mr. Penn performed at Micro Images had a Specific Vocational Preparation ("SVP") of 2 and no skills demand.[2]  (AR 43.)

The ALJ's first hypothetical posited "a person who could sit for six hours, but stand and/or walk less than even two hours each; lift and/or carry less than 10 pounds even occasionally, never climb, balance, stoop, kneel, crouch, crawl or work around hazards, and need numerous unscheduled rest breaks."  (AR 44.)  The ALJ then asked the VE whether the hypothetical person would be able to perform any full-time jobs.  (*Id.*)  The VE said no.  (*Id.*)

The second hypothetical involved an individual who "could sit, stand, walk, six out of eight hours each with normal breaks, lift or carry 20 pounds occasionally and 10 pounds occasionally; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; would have to avoid excessive vibrations and all hazards; could not work around even moderate vibrations; could never climb ladders, ropes or scaffolds."  (AR 44.)  The VE testified that with all those limitations, an individual could do the label coder jobs.  (*Id.*)  The VE also testified that there are other jobs that could be performed by the hypothetical person in the California economy, such as garment sorting (DOT #22.687-014) and ticket taking (DOT #344.677-010).  (AR 45.)

Mr. Penn's attorney asked, "[I]f the individual in hypothetical two was required to use a cane for all ambulation [or for steadying while standing], would that person be able to work" as a label coder, garment sorter or ticket taker?  (*Id.*)  The VE testified that the garment sorting would be still available for a person who used a cane for ambulation, but none of those jobs would be available for a person who needed to use a cane when standing.  (AR 45, 46.)  When asked about a hypothetical person who was limited to standing or walking for no more than two hours in a workday, could lift

---

[2] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  Social Security Ruling 00-4p (SSR 00-4p).

UNITED STATES DISTRICT COURT
For the Northern District of California

1    no more than 10 pounds, and was required to use a cane, the VE testified that these limitations

2    would rule out all those jobs.  (AR 46.)

3    **D.  The ALJ's Findings**

4        Applying the sequential evaluative process as discussed below, the ALJ held on August 8, 2012,

5    that Mr. Penn was not disabled under § 1614(a)(3)(A) of the Social Security Act and therefore not

6    entitled to SSI benefits.  (AR 20.)

7        At step one, the ALJ found that Mr. Penn had not engaged in substantial gainful activity since

8    October 14, 2010, the application date.  (AR 15.)

9        At step two, the ALJ found that Mr. Penn had the severe impairment of status post spinal injury.

10   (*Id.*)  The ALJ also determined that Mr. Penn's impairment was severe because it more than

11   minimally affected his ability to perform basic work activities.  (*Id.*)

12       At step three, the ALJ found that Mr. Penn did not have an impairment or combination of

13   impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

14   Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).  (*Id.*)  The ALJ also

15   found that the medical evidence contained no findings that Mr. Penn's impairment had reached a

16   degree of severity that would meet or equal a listed impairment.  (*Id.*)

17       At step four, the ALJ found that Mr. Penn had the residual functional capacity to perform light

18   work except he was never able to climb ladders, ropes, or scaffolds.  (*Id.*)  The ALJ acknowledged

19   that Mr. Penn was occasionally able to climb ramps and stairs, balance, stoop, kneel, crouch, and

20   crawl.  Mr. Penn needed to avoid environments with even moderate exposure to vibration.

21   Moderate exposure is defined as more than concentrated exposure but less than all exposure.  The

22   ALJ noted that Mr. Penn should avoid all exposure to hazards.  (*Id.*)

23       In making this finding, the ALJ first considered Mr. Penn's symptoms and how consistent they

24   were with the objective medical evidence and other evidence, based on the requirements of 20 CFR

25   416.929 and SSRs 96-4p and 96-7p.  (*Id.*)  The ALJ then determined whether there was an

26   underlying medically-determinable physical or mental impairment that reasonably could be expected

27   to produce Mr. Penn's pain and symptoms and then evaluated the intensity, persistence, and limiting

28   effects of the symptoms to determine the extent that they limited Mr. Penn's functioning.  (AR 16.)

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1   To the extent that Mr. Penn's statements about the intensity or functionally limiting effects of pain

2   or other symptoms were not substantiated by objective medical evidence, the ALJ made findings on

3   the credibility of the statements "based on a consideration of the entire case record." (*Id.*)

4       The ALJ summarized Mr. Penn's claim that he suffered from constant pain in his back and neck

5   and stiffness in his hands. (*Id.*) In addition, Mr. Penn alleged that he had become disabled since

6   July 4, 1997 and his impairments included a spinal injury, nerve damage, arthritis, and a total left hip

7   replacement. (*Id.*) The ALJ acknowledged Mr. Penn's statement that his pain prevented him from

8   being able to tie his shoelaces or button his shirt, and he lacked stamina due to a heart murmur. (*Id.*)

9       The ALJ found that Mr. Penn's "medically determinable impairment could reasonably be

10  expected to cause his alleged symptoms" but found his statements about the intensity, persistence,

11  and limiting effects of these symptoms not credible to the extent they were inconsistent with the

12  functional limitations described by Dr. Liang and Dr. Selcon. (AR 17.)

13      The ALJ gave little weight to the examining physician Dr. Selcon's opinion that Mr. Penn had

14  no functional limitations. (*Id.*) While Dr. Selcon's opinion was consistent with his examination, the

15  ALJ found that there was evidence in the records that showed Mr. Penn to be more limited than Dr.

16  Selcon opined. (AR 17, 18.)

17      The ALJ also gave Dr. Liang's May 10, 2011 opinion reduced weight. (AR 18.) The ALJ

18  described that opinion as restricting Mr. Penn to a light duty, sitting position with no lifting. (*Id.*)

19  The ALJ found that Dr. Liang's medical record or treatment notes did not support such severe

20  functional limitations on the part of Mr. Penn, given Mr. Penn's conservative treatment, the

21  examination by Dr. Selcon, and Mr. Penn's account of his activities of daily living. (*Id.*) For

22  example, Mr. Penn testified he refused to undergo a laminectomy which was recommended by his

23  doctor. (*Id.*) He continued to smoke five cigarettes a day against medical advice. (*Id.*) Two

24  months prior to the hearing, he smoked one pack per day. (*Id.*) Mr. Penn also stated he lived alone

25  in a hotel and was able to microwave his food and utilize public transportation. (*Id.*) He went

26  fishing once every other week and visited with a friend three or four times per week. (*Id.*)

27      The ALJ also gave reduced weight to the opinions of Dr. Wernar, Dr. Gershan, Dr. Aguilera and

28  Dr. Hopkins (which were from 1998, 2004, 2008, and 2009 respectively) because they were all

UNITED STATES DISTRICT COURT
For the Northern District of California

1   before "the relevant time period of the claimant's application." (*Id.*) In addition, during the relevant

2   time period, the ALJ found that the medical record taken as a whole did not indicate the severe

3   functional limitations described by Dr. Wernar, Dr. Gershan, Dr. Aguilera and Dr. Hopkins. (*Id.*)

4       On the other hand, the ALJ gave great weight to the assessment of examining physician Dr.

5   Zheutlin on July 21, 2011. (AR 17.) "Dr. Zheutlin opined that the claimant is able to perform light

6   work with the following restrictions. Dr. Zheutlin found that the claimant is occasionally able to

7   balance[3], stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant is never able to

8   climb ladders, ropes, or scaffolds. The doctor found that the claimant should avoid all exposure to

9   hazards and even moderate exposure to vibration." (*Id.*) The ALJ accorded great weight to Dr.

10  Zheutlin's opinion because it was based upon a review of the medical record and was consistent

11  with the medical record taken as a whole. (*Id.*) The medical record supported a reduction in Mr.

12  Penn's functional ability to light work based upon diagnostic findings of moderate degenerative

13  changes of the lumbar spine and of an abnormal finding of Mr. Penn's left hip. (*Id.*) "However, the

14  the medical evidence supports the claimant's ability to perform a wide range of light work based

15  upon the examination performed by Dr. Selcon, the claimant's conservative treatment, and the

16  claimant's varied activities of daily living." (*Id.*)

17      At step five, the ALJ concluded that Mr. Penn was "capable of performing past relevant work as

18  a label coder." (AR 18.) This work is unskilled and "does not require the performance of work

19  related activities precluded by Mr. Penn' residual functional capacity." (*Id.*) Considering Mr. Penn

20  performed this job recently, did so long enough to learn it, and was compensated for it at above

21  substantial gainful activities levels, label coding qualifies as past relevant work. (*Id.*) Mr. Penn was

22  46 years old, which is defined as a younger individual age 18-49, on the date of filing the hearing

23  application. (AR 19.) He was able to communicate with English and had received at least a high

24  school education. (*Id.*) The ALJ then determined that there were other jobs that exist in

25  significant numbers in the national economy that the claimant could perform, given his residual

26

27

28      [3] As summarized *supra* at II.B.2., Dr. Zheutlin actually opined that Mr. Penn can never
    balance. (AR 292.)

1  functional capacity, age, education, and work experience.  (*Id.*)  The ALJ noted that the VE testified

2  the demands of Mr. Penn's past relevant work did not exceed his residual functional capacity.  (*Id.*)

3  The ALJ also said that the VE testified that Mr. Penn would be able to perform the requirements of

4  representative occupations in the state of California such as garment sorter (light) and ticket taker.

5  (*Id.*)

6      The ALJ thus concluded the sequential process by stating that Mr. Penn "has not been under a

7  disability, as defined in the Social Security Act, since October 14, 2010, the date the application was

8  filed."  (AR 20.)

9  **III.  ADDITIONAL INFORMATION SUBMITTED WITH MOTION**

10      On October 22, 2014 (as discussed above in the Procedural History), Mr. Penn filed a "Motion to

11  Show Cause on Summary Judgment," arguing that the Commissioner improperly denied his claim

12  for benefits because an ALJ previously awarded him benefits (presumably after his back injury in

13  1997), and he should be entitled to benefits retroactive to the date he reapplied for benefits on

14  October 30, 2010.  (Motion, ECF No. 17 at 3.)  Mr. Penn attached to his motion a medical report

15  issued by Dr. Elvis Tanson on October 2, 2014 that notes Mr. Penn's "physical condition . . .

16  prevents him from engaging in the [San Joaquin County] workfare program."  (*Id.* at 8.)  That

17  program is defined elsewhere on the form as a community service program that includes picking up

18  litter, digging, raking, planting trees, garbage emptying, and other unspecified community service.

19  (*Id.*)  Dr. Tanson specifies in a section called "Diagnosis and Prognosis" that Mr. Penn's condition is

20  "chronic diarrhea, back surgery and pain, and hip surgery and pain."  (*Id.*)  He notes the "expected

21  duration" of that condition is "permanent" and specifies that Mr. Penn "cannot stand > 5 minutes.

22  No climbing.  No bending.  Constant diarrhea too."  (*Id.*)  In addition to Dr. Tanson's October 2,

23  2014 report, Mr. Penn also attached four treatment notes of Dr. E. Tanson, Dr. Rapert and Dr.

24  Gabriel K. Tanson from 2002 and 2003 about his right leg weakness (September 2002), generalized

25  pain, partial paraplegic walking with difficulty with a cane, and degenerative joint disease with

26  peripheral neuropathy, secondary to a spinal injury (November 2002), medication refill with

27  physical condition unchanged since last visit (April 2003), and checkup and medication refill with

28  the description that patient presented because of neck and shoulder pain (August 2003).  (*Id.* at 11,

UNITED STATES DISTRICT COURT
For the Northern District of California

1    12.)  Dr. Gabriel Tanson notes that Mr. Penn "was significantly damaged in an auto accident several

2    years earlier and was almost quadriplegic.  He recovered satisfactorily, except for residual back pain

3    and muscle spasms . . .  Patient in no severe distress. . .  SI and S2 are normal.  Peripheral pulses are

4    normal.  Musculoskeletal system is within normal limits.  Neurological examination is also normal."

5    (*Id.*)

6                                          **ANALYSIS**

7    **I.  LEGAL STANDARD**

8         **A.  Standard of Review**

9         Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

10   Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

11   aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

12   are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v.*

13   *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

14   than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

15   might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

16   Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a

17   different outcome, the court must defer to the ALJ's decision and may not substitute its own

18   decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).  The court may,

19   on motion of the Commissioner of Social Security made for good cause shown before the

20   Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social

21   Security for further action by the Commissioner of Social Security, and it may at any time order

22   additional evidence to be taken before the Commissioner of Social Security, but only upon a

23   showing that there is new evidence which is material and that there is good cause for the failure to

24   incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g).

25        **B.  Applicable Law: Five Steps to Determine Disability**

26        An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

27   or mental impairment which can be expected to result in death or which has lasted or can be

28   expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(I).

> **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.**  Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.**  Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

## II. DISCUSSION

### A.  Even If Mr. Penn Had Previously Been Determined to be Disabled, He Was Not Entitled to the Presumption of Continuing Disability

Mr. Penn argues that because he previously was determined to be disabled and received benefits, he should be determined to be disabled and receive benefits now, too.  (Motion, ECF No. 17 at 2, 3.)

1   His benefits were terminated when he was incarcerated in 2004.

2       The Ninth Circuit squarely addressed this situation in *Stubbs-Danielson v. Astrue*, 539 F.3d 1169

3   (9th Cir. 2008), and its explanation is worth quoting in full.  It explained:

> . . . Stubbs-Danielson received SSI benefits from 1986 until her incarceration in
> 1994, which resulted in termination of benefits.  She argues the ALJ erred in failing
> to apply a presumption of disability based on this earlier receipt of benefits.
>
> In *Warren v. Bowen*, 804 F.2d 1120 (9th Cir. 1987) (per curiam), this court held
> that while the social security administrator may be foreclosed from reevaluating the
> disability determinations for current beneficiary recipients, the administrator is not
> required to presume that a previous disability has continued through a non-medically
> related termination of benefits.  *Id.* at 1121.  We examined then-existing regulations
> which provided that an applicant whose benefits were terminated for a non-medical
> reason would not be required to resubmit evidence of his disability if the
> re-application came within one year of the prior termination.  *Id.* (citing 20 C.F.R. §
> 416.1321(b) (1986)).  We reasoned that such regulations supported the position that a
> presumption of disability should not extend to an applicant whose re-application
> came almost three years—i.e., more than one year—after a non-medical termination.
> *Id.*
>
> The existing regulations compel the same result in this case.  The current
> regulations state that a claimant's benefits are suspended upon incarceration, and
> after 12 months of continuous suspension, benefits are terminated.  *See* 20 C.F.R. §§
> 416.1325, 416.1335.  While the regulations provide for the resumption of suspended
> benefits upon an otherwise eligible recipient's release from custody, *see* 20 C.F.R. §
> 416.1325(b), they provide for no such reinstatement where a recipient's eligibility has
> been terminated after 12 consecutive months of suspension.  Accordingly, there is no
> basis for applying a presumption of continuing disability where, as here, a claimant's
> reapplication comes at least 6 years after a termination of benefits and more than 15
> years after her previously successful application.

18  *Id.* at 1172.

19      The regulations examined by the Ninth Circuit in *Stubbs-Danielson*—20 C.F.R. § 416.1325 and

20  20 C.F.R. § 416.1335—are still in effect and apply equally to Mr. Penn's situation.  Mr. Penn was

21  awarded benefits sometime between 1997 and 2004, and those benefits were terminated after he was

22  incarcerated in 2004.  He did not submit his pending application for benefits until 2010, several

23  years after his benefits were terminated due to his incarceration.  Accordingly, the ALJ was not

24  required to apply a presumption of continued disability.  *See Kimmins v. Colvin*, No.: 12-cv-4206-

25  YGR, 2013 WL 5513179, at *6-7 (N.D. Cal. Oct. 4, 2013) (following *Stubbs-Danielson* and

26  concluding that the ALJ was not required to apply a presumption where the claimant's prior benefits

27  were terminated in 2004 due to his incarceration and the claimant did not re-apply for benefits until

28  2009); *Croenne v. Colvin*, No. EDCV 12-0855 RNB, 2013 WL 812638, at *1 (C.D. Cal. Mar. 5,

1   2013) (following *Stubbs-Danielson* and concluding that the ALJ was not required to apply a

2   presumption where the claimant's prior benefits were terminated in 2008 due to his incarceration);

3   *Williams v. Astrue*, No. CV 10-2201-PHX-JAT, 2011 WL 3273577, at *7 (D. Ariz. Aug. 1, 2011)

4   (following *Stubbs-Danielson* and concluding that the ALJ was not required to apply a presumption

5   where the claimant's prior benefits were terminated in 2004 due to his incarceration and the claimant

6   did not re-apply for benefits until 2008); *Nickerson v. Astrue*, No. 1:10-cv-01315 JLT, 2011 WL

7   3207813, at *8-9 (following *Stubbs-Danielson* and concluding that the ALJ was not required to

8   apply a presumption where the claimant's prior benefits were terminated in March 2006 due to his

9   incarceration and the claimant did not re-apply for benefits until September 2007).[4]

10  **B. The ALJ Met His Duty to Develop the Medical Record**

11          To the extent that Mr. Penn argues that the ALJ simply did not meet his duty to sufficiently

12  develop the medical record, the court finds that, under the circumstances before him, the ALJ did so.

13  "The Commissioner is required to develop the claimant's complete medical record for at least the 12

14  months preceding the month in which the claimant filed their disability application unless there is

15  reason to believe the development of an earlier period is necessary to determine the claimant's

16  disability status." *Avidano v. Astrue*, No. C-09-3274 RMW, 2012 WL 1110019, at *4 (N.D. Cal.

17  Mar. 31, 2012) (citing 20 C.F.R. § 416.912(d)). "In evaluating whether the ALJ fulfilled his duty to

18  develop the record, the Ninth Circuit has held that an ALJ 'has a special duty to fully and fairly

19  develop the record and to assure that the claimant's interests are considered.'" *Id.* (quoting *Brown v.*

20  *Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). "But, the ALJ is only required to develop the record

21  further when there is ambiguous evidence or when the record is inadequate to allow for proper

22  evaluation of the evidence." *Id.* (citing *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001));

23  *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (same). "If the claimant is

24  unrepresented, the ALJ has a heightened duty and must 'scrupulously and conscientiously probe

25  into, inquire of, and explore for all the relevant facts.'" *Avidano*, 2012 WL 1110019, at *4 (citing

26

27  _____

28          [4] As the hearing transcript shows, the ALJ knew that Mr. Penn received disability benefits
    previously. (*See* AR 39.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1  *Vidal v. Harris*, 637 F.2d 710, 711 (9th Cir. 1981)).  "Finally, when a claimant is both unrepresented

2  and suffers from a mental impairment, the ALJ's duty to carefully develop the record is even

3  greater." *Id.* (citing *Thompson v. Schweiker*, 665 F.2d 936, 941 (9th Cir. 1982)).

4  Although Mr. Penn is proceeding *pro se* here, he was represented by at counsel during the

5  proceedings below.  On March 27, 2012, attorney Shellie Lott submitted a pre-hearing brief to the

6  ALJ on behalf of Mr. Penn, and she represented Mr. Penn at the July 19, 2012 hearing before the

7  ALJ.  (AR 25, 232-33.)  There also is no evidence that Mr. Penn suffered from a mental impairment

8  when he was before the ALJ.  And as recounted above, the record in this case contains medical

9  evidence from as early as 1997, when Mr. Penn was injured, and up until 2011.  It contains records

10 related to his hospital stay in 1997, a 1998 report from the physician who treated him in 1997 and

11 1998 (Dr. Werner), a 2001 report from the physician who treated him in 2000 and 2001 (Dr.

12 Gershan), records from doctors who examined Mr. Penn while he was incarcerated (Drs. Lotersztain

13 and Aguilera), records from Community Medical Centers from December 29, 2010 to December 12,

14 2011, records from his treating physician (Dr. Liang) at San Joaquin General Hospital throughout

15 2012, the June 13, 2011 report of the state agency consultant who performed a complete internal

16 medicine evaluation of Mr. Penn (Dr. Selcon), and the July 21, 2011 report from another state

17 agency consultant who examining Mr. Penn (Dr. Zheutlin).  The court believes that the ALJ fulfilled

18 his duty to sufficiently develop Mr. Penn's medical records: there was no ambiguous evidence and

19 the record was adequate to allow for proper evaluation of the evidence.

20 **C. Mr. Penn Failed to Provide Good Cause for Not Submitting New Evidence Earlier**

21 In reviewing social security appeals, the court may not consider evidence outside of the

22 administrative record, or acquire evidence and make factual determinations.  "The role of the courts

23 is wholly appellate." *Ellis v. Bowen*, 820 F.2d 682, 684 (5th Cir. 1987).  Upon receipt of new

24 evidence, the court may only remand a case to the Commissioner for further action by the

25 Commissioner.  42 U.S.C.A. § 405(g).  "Under 42 U.S.C. § 405(g) (Supp. 2001), in determining

26 whether to remand a case in light of new evidence, the court examines *both* whether the new

27 evidence is material to a disability determination *and* whether a claimant has shown good cause for

28 having failed to present the new evidence to the ALJ earlier." *Mayes*, 276 F.3d at 461-62 (emphasis

1    added).

2        Mr. Penn has not satisfied either criterion.  "To be material under section 405(g), the new

3    evidence must bear 'directly and substantially on the matter in dispute.'"  *Id.* at 462 (quoting *Ward v.*

4    *Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982)).  Mr. Penn "must additionally demonstrate that there

5    is a 'reasonable possibility' that the new evidence would have changed the outcome of the

6    administrative hearing."  *Id.* (quoting *Booz v. Secretary of Health & Human Servs.*, 734 F.2d 1378,

7    1380-81 (9th Cir. 1983)).  As for good cause, a claimant does not establish it "by merely obtaining a

8    more favorable report once his or her claim has been denied."  *Id.* at 463.  "To demonstrate good

9    cause, the claimant must demonstrate that the new evidence was unavailable earlier."  *Id.* (citing *Key*

10   *v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) ( "If new information surfaces after the Secretary's

11   final decision and the claimant could not have obtained that evidence at the time of the

12   administrative proceeding, the good cause requirement is satisfied")).  "The claimant must also

13   establish good cause for not having sought the expert's opinion earlier."  *Id.* (citing *Clem v. Sullivan*,

14   894 F.2d 328, 332 (9th Cir. 1990)).

15       Mr. Penn' new evidence is Dr. Elvis Tanson's October 2, 2014 medical report and the four

16   treatment notes of Dr. E. Tanson, Dr. Rapert and Dr. Gabriel Tanson from 2002 and 2003.  (*See*

17   Motion ECF No. 17 at 2, 3.)  Dr. Elvis Tanson's medical report is from 2014, after the ALJ denied

18   Mr. Penn's claim, and Mr. Penn does not demonstrate why he could not have sought the opinion

19   earlier.  It also is not material because it is about Mr. Penn's ability to perform acts of community

20   service (e.g., picking up litter, digging, raking, planting trees, garbage emptying, and other

21   unspecified acts) that require a level of physicality that everyone, including the ALJ, agreed were

22   beyond Mr. Penn's capabilities.  The other doctor's notes are from 2003 and 2004 and simply are

23   not new evidence; it is old evidence that Mr. Penn did not provide to the ALJ.  *See* 42 U.S.C. §

24   423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes

25   such medical and other evidence of the existence thereof as the Secretary may require."); *see Mayes*,

26   276 F.3d at 459 ("It was Mayes' duty to prove that she was disabled.")  And as determined above,

27   the ALJ fulfilled his duty to make sure the medical record was sufficiently developed.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**D.  The ALJ's Decision**

Considering that Mr. Penn is representing himself, the court notes a few other issues it noticed when reviewing the record.  First, the court notes that the ALJ gave reduced weight to the opinion of Dr. Liang.  (AR 234.)  The court finds the ALJ properly discounted Dr. Liang's opinion because Dr. Liang stated that the evaluation for Mr. Penn's work capacity was beyond his scope of expertise. (AR 325.)  Besides that, even though "a treating physician's opinion is entitled to more weight than an examining physician's opinion," the ALJ has provided specific and legitimate reasons to disregard the treating physician's opinion.  *Ryan v. Commissioner of Social Sec.*, 528 F.3d 1194, 1204 (9th Cir. 2008); *see Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1996).  The ALJ pointed out that the medical record of Dr. Liang "does not support such severe functional limitations" of Mr. Penn based on Mr. Penn's conservative treatment and activities of daily living and Dr. Selcon's medical opinion.  (AR 18.)

Second, the court notes that the ALJ found Mr. Penn's testimony to be lacking in credibility. (AR. 235-36.)  To determine whether a claimant's testimony about subjective pain or symptoms is credible, the ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that reasonably could be expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504 F.3d at 1036.  Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear, and convincing reasons for doing so.  *Id.*; SSR 96-7p.  This court defers to the ALJ's credibility determination if it is supported by substantial evidence in the record.  *See  Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).  Here, the ALJ found that Mr. Penn's "medically determinable impairment could reasonably be expected to cause the alleged symptoms," but he also found that Mr. Penn's testimony about the severity of those symptoms were not in line with the medical evidence.  (AR 17.)  The ALJ found Mr. Penn's statements about the intensity, persistence, and limiting effects of these symptoms to be inconsistent with the functional limitations described by Dr. Liang and Dr. Selcon.  (*Id.*)  The ALJ also found Mr. Penn's described daily activities are "not

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   limited to the extent one would expect, given the complaints of disabling symptoms and limitations."

2   (*Id.*)  The court finds that the ALJ did not err by discounting Mr. Penn's testimony.

3       Third, the court notes that, with respect to Mr. Penn's postural limitations, Dr. Zheutlin, whose

4   report the ALJ accorded great weight, found that Mr. Penn can never balance.  (AR 292.)  The ALJ,

5   however, stated that Dr. Zheutlin found that Mr. Penn could occasionally balance.  (AR 17.)  District

6   courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on

7   legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. §

8   405(g); *Vasquez*, 572 F.3d at 591 (quotation omitted).  "Substantial evidence means more than a

9   mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

10  accept as adequate to support a conclusion."  *Andrews*, 53 F.3d at 1039.  If the evidence in the

11  administrative record supports both the ALJ's decision and a different outcome, the court must defer

12  to the ALJ's decision and may not substitute its own decision.  *See id.*; *accord* Tackett, 180 F.3d at

13  1097-98.  Moreover, in social security cases, "an ALJ's error is harmless where it is inconsequential

14  to the ultimate nondisability determination."  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)

15  (internal citations omitted).  In other words, the Ninth Circuit "look[s] at the record as a whole to

16  determine whether the error alters the outcome of the case."  *Id.*

17      The ALJ's misstatement of Dr. Zheutlin's finding regarding Mr. Penn's ability to balance may

18  well have been inadvertent.  Other evidence in the record supports the ALJ's residual functional

19  capacity finding.  Dr. Selcon, for instance, said that Mr. Penn used, but did not require, a cane for

20  balancing.  (AR 278.)  But given the VE's statement that no jobs would be available for someone

21  who needs a cane while standing (*see* AR 45-46), the court remands for the ALJ to consider the

22  VE's statement in light of Dr. Zheutlin's characterization of Mr. Penn's limitations.

23      This approach is supported by the case law regarding remand versus an award of benefits.  It is

24  within the court's discretion to either to remand a case for further administrative proceedings or for

25  an award of benefits.  *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  Remand is

26  warranted where additional administrative proceedings could remedy defects in the decision.  *See*,

27  *e.g.*, *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984).  On the other hand, a court may forgo a

28  remand where "further proceedings [are] unnecessary if the record is fully developed and it is clear

from the record that the ALJ would be required to award benefits." *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001). Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated. *See Vasquez*, 572 F.3d at 593.

Because the court cannot tell from the record how the ALJ approached this issue given his crediting of Dr. Zheutlin's assessment, remand to the ALJ for further consideration is in order. *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1235 (9th Cir. 2011) (remanding action and directing the ALJ to consider a psychiatric evaluation and medical source statement that the claimant previously submitted to Appeals Council but which the Appeals Council improperly failed to consider). Put another way, the record is not fully developed and it is not clear, at this stage, whether the benefits should be granted or not. On remand, the ALJ must consider (or may explicitly state in his opinion if he in fact did so) Dr. Zheutlin's characterization of Mr. Penn's limitations in the context of the VE's description of the effect the limitations had on jobs available in the economy. (*Compare* AR 290-95 (Zheutlin report) *with* AR 45-45 (VE's testimony).)

## CONCLUSION

For the foregoing reasons, the court grants Mr. Penn's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the action for further proceedings.

This disposes of ECF Nos. 17 and 19.

**IT IS SO ORDERED.**

Dated: March 23, 2015

_____
LAUREL BEELER
United States Magistrate Judge